Marland & others *v.* Stanwood.

JAMES S. MARLAND & others *vs.* JACOB STANWOOD.

**A.** merchant in Boston ordered cotton brokers in Mobile to buy for him one hundred and fifty bales of cotton, "best you can," but at not more than forty-two cents per pound. Three months afterwards, on their first opportunity to buy within the limited price, the brokers bought seventy-eight bales of cotton for forty cents per pound, shipped them to the merchant, forwarded to him the bill of lading, drew on him against them, and advised him of what they had done. To their advices he replied that he repudiated the purchase on the ground that there had been unreasonable delay and bad judgment in making it; and thereupon they directed him to turn over the bill of lading to their agents at Boston, and caused the cotton to be sold on their own account, the result being a large loss. In an action by them against him to recover for this loss, *Held,* that the defence, that his order was for an entire purchase of one hundred and fifty bales, and that he was not bound to accept and pay for any less quantity, was not open to him; that the fact that, when they directed him to turn over the bill of lading to their agents, they did not give him notice that they should hold him responsible for any loss on the cotton, was not a bar to the action; and that the question whether there was a mutual rescission of the contract was for the jury.

CONTRACT. Writ dated December 5, 1866. The declaration alleged that the defendant, on November 24, 1865, employed the plaintiffs, who were commission merchants at Mobile in Alabama under the firm of J. L. Abbott & Company, to buy for him and on his account, one hundred and fifty bales of middling cotton, at the rate of forty-two cents per pound, and ship them to him at Boston; that the plaintiffs "in pursuance of such employment, and as soon thereafter as they could purchase said cotton at said limited price, to wit, on February 17, 1866, did purchase for the defendant, at Mobile, seventy-eight bales of middling cotton, weighing 37,998 pounds, at the rate of forty cents per pound, which was all the plaintiffs could buy, up to said time, at said limit of forty-two cents per pound, and immediately shipped the same to the defendant at Boston, and at the time of said purchase notified the defendant of said purchase

and the terms thereof, but the defendant, on receiving said notice, to wit, on the 27th and 28th days of said February, refused to receive the cotton so purchased for him, and repudiated said purchase;" that the sum which the plaintiffs paid for the cotton was $15,199.20, and their commissions and the charges of shipping amounted to $395.26; "that they were obliged to sell and dispose of the cotton in Boston, by reason of the defendant's refusal to perform his contract and to receive and pay for the cotton, and did so sell and dispose of the cotton for the largest sum for which they could sell it, and lost upon said sale made by them $2,500;" and that the defendant owed them that amount with interest, and also the amounts, with interest, of two bills of exchange drawn by them on the defendant, on account of their purchase of the cotton, the first on February 21, 1866, for $15,000, and the second on February 23, 1866, for $751.97, each payable three days after sight, which bills, it was alleged, the defendant accepted, but refused to pay, on presentment for payment according to the terms of his acceptance, whereby the plaintiffs were obliged to pay the amounts of them to the holder.

The answer denied each and every allegation of the declaration: and alleged that whatever order the defendant in November 1865 gave to the plaintiffs had expired, and, if they bought any cotton as they alleged, they did so without the defendant's authority or consent, and without due care and judgment; that it was true that they reported to the defendant a purchase of cotton alleged to be for him, but he at once repudiated the purchase; and that, if the defendant accepted the bills of exchange described in the declaration, he did so without consideration, and solely for the plaintiffs' accommodation, and under an express agreement that the plaintiffs should provide for them when due.

At the trial in the superior court, before *Lord,* J., these facts appeared: On November 22, 1865, the defendant telegraphed to the plaintiffs, " Buy 150 bales according to my letter 7th inst., best you can," and on the same day wrote to them, confirming this order, and expressing a hope that the plaintiffs

might be able to fill it at satisfactory prices. On November 24 he telegraphed again, " I limit my order to 42 cents, including revenue tax," and on the same day wrote to the plaintiffs to the same effect, and expressed a hope that the telegram might reach the plaintiffs before they should fill the order. All these telegrams and letters were received by the plaintiffs.

On February 17, 1866, the plaintiffs wrote to the defendant, advising him of their purchase of forty-nine bales of middling cotton, " at 39 to 40 cts.," upon his order of November 1865, and that they hoped to report the completion of the purchase of the whole hundred and fifty bales early in the following week. On February 21 they wrote again, advising the defendant of their draft for $15,000 " against purchase 80 [78 ?] b. c. on your order for 150 b. c.," and expressed regret that they were rendered unable to complete the order by a sudden advance in the price of cotton, caused by news from Liverpool. On February 23 they again wrote, advising the defendant of their draft for $751.97 " against balance invoice 78 b. c. for your account," and inclosed in the letter the bill of lading, invoice and account current, of the seventy-eight bales; and on February 24 they mailed to the defendant receipts for the payment of the revenue tax on the cotton, and express-receipts for samples of it which they had forwarded to the defendant by express.

The plaintiffs' letter of February 17 reached the defendant on February 27, when he replied by telegraph, acknowledging its receipt, and adding, " Purchase repudiated ; " and on February 28 he wrote to them, inclosing a copy of the telegram, repeating his repudiation of the purchase, and adding, " The idea of an order that was telegraphed nearly three months ago being now filled, after lying over this length of time, and on a falling market, is a manner of doing business that I am not much used to."

The member of the plaintiffs' firm who bought the cotton testified " that the order was never countermanded by the defendant ; that he bought as soon as cotton reached the limit of the order ; that seventy-eight bales were all he could buy within the limit, as the price immediately rose, and did not fall to the limit

until after he had received the defendant's telegram repudiating the purchase; and that when the order was given cotton was much above the limit in price."

On February 28 the plaintiffs telegraphed to the firm of Gardner, Dexter & Company at Boston, to obtain from the defendant the bill of lading of the seventy-eight bales of cotton, protect the plaintiffs' drafts, and sell the cotton on the plaintiffs' account; and on the same day telegraphed to the defendant to turn over the bill of lading to Gardner, Dexter & Company, " they paying drafts," and also wrote to the defendant, acknowledging the receipt of his telegram of February 27, expressing surprise at it, stating that in making the purchase they acted on the defendant's order of November 1865, as it had never been cancelled, and further stating the substance of their instructions to Gardner, Dexter & Company.

The two drafts, on coming to hand at Boston, were accepted by the defendant on March 2, 1866, and on March 8, which was the last day of grace, were paid at the bank to which they were sent from Mobile for collection. The defendant, on one side, and Gardner, of the firm of Gardner, Dexter & Company, on the other side, gave conflicting testimony on the subject of the acceptance and payment of the drafts, substantially as follows. It appeared that on March 1, Gardner called upon the defendant, and showed to him the plaintiffs' telegram of February 28 to Gardner, Dexter & Company.

The defendant testified " that, on March 1, he told Gardner that he should accept the drafts, as he did not desire to injure the credit of the plaintiffs, and should pay them at their maturity, but that, after that was done, he would comply with the plaintiffs' direction, and turn over the bill of lading and other documents to Gardner, Dexter & Company, upon receiving from them the amount of the drafts which he had paid and other expenses incurred by him; that Gardner assented to this, and that he consequently accepted the drafts on the 2d and paid them on the 8th, and thereafter on the same day indorsed the bill of lading and other documents to Gardner, Dexter & Company, upon receiving from them their check for the amount of

the drafts and other expenses incurred in reference to the cotton."

Gardner testified " that he had no authority except to protect the drafts of the plaintiffs on the defendant; that he showed the plaintiffs' telegram to the defendant on March 1, and told him that he (Gardner) was prepared to protect the drafts ; that the defendant replied that he had not determined whether he should take the cotton or not, but would do so and inform Gardner ; that the next day, or within a few days, the defendant informed him that he would not take the cotton, but said he proposed taking up himself all drafts drawn on him, and requested Gardner to furnish him with the means so to do ; that Gardner assented to this request, furnished a check for the drafts and some expenses paid for insurance and expressage, which was taken by the defendant, who soon after returned with the drafts, bill of lading and invoice of the cotton, which he delivered to Gardner ; that until the drafts were so delivered to him he never knew they had been accepted by the defendant; and that this was all that ever passed between his house and the defendant on the subject of the cotton."

The cotton arrived at Boston late in March, and was received by Gardner, Dexter & Company, and sold by them, on account of the plaintiffs, in April. The defendant was not informed of the arrival of the cotton, nor consulted in regard to the sale, nor aware when it took place. Gardner, Dexter & Company rendered an account to the plaintiffs, showing a loss on the cotton of $2,429.48, which amount the plaintiffs paid to them. It was not contended by the defendant that the cotton was not sold to the best advantage, or that any larger sum could have been obtained for it than it was sold for. No account of the sale of the cotton was ever rendered to the defendant, but shortly before bringing this action the plaintiffs' counsel made a demand on the defendant.

There was controversy in the case as to whether, on other evidence, not now material, any revocation was shown of the defendant's order, prior to the purchase of the seventy-eigh' bales, " but that question was submitted to the jury under instructions to which no exceptions were taken."

The defendant presented three prayers for instructions to the jury, as follows:

1. " That the contract set out in the declaration is an entire contract; and that, the plaintiffs not having bought one hundred and fifty bales of cotton on account of the defendant, but notifying him that they had bought seventy-eight bales and could not complete the order, and the defendant declining to receive the seventy-eight bales, and not receiving the same, the plaintiffs cannot maintain their action on the first count in their declaration."

2. " That, if the defendant, upon receiving notice from the plaintiffs that they had bought seventy-eight bales of cotton on his account, although he had not prior to that time countermanded the order, notified them that he repudiated the purchase of the cotton made by them on his account, and they thereupon directed the defendant to deliver the bills of lading to their agent, and directed their agent to receive and sell the same on their account, and their agent did so receive and sell the same, and they did not, at the time they directed the defendant to deliver said bill of lading to their agent, notify or inform the defendant that they should hold him responsible for loss on the sale of the cotton, the plaintiffs cannot maintain their action."

3. " That, upon the uncontroverted facts in evidence, the plaintiffs are not entitled to maintain their action."

When the question of law, suggested in the first prayer for instructions, was first raised, during the course of the trial and before the close of the evidence, some conversation occurred between the presiding judge and the defendant's counsel as to whether such a defence was open under the answer, and as to amending the answer so as to remove any doubt of its admissibility; but no amendment was made.

The judge did not give either of the instructions requested, and " submitted the case to the jury, to determine, upon the evidence, whether the defendant's order to the plaintiffs was countermanded prior to the purchase of the seventy-eight bales by the latter, and whether the parties agreed to rescind the contract, instructing them that, if they were satisfied that the order was

so countermanded, or that the parties agreed to rescind the contract, they must find for the defendant, otherwise for the plaintiffs." The jury found for the plaintiffs, with $2708.87 damages; and the defendant alleged exceptions.

*R. M. Morse, Jr., & R. Stone, Jr.,* for the defendant. 1. The declaration alleges only a partial performance of the contract. The answer denies each and every allegation in the declaration. The point of law raised by the first prayer for instructions arises on the face of the declaration, and might have been raised by demurrer, but can also be taken advantage of by the defendant although no demurrer was filed. *Hervey* v. *Moseley,* 7 Gray, 479. *Hubbard* v. *Moseley,* 11 Gray, 171. *Oliver* v. *Colonial Gold Co.* 11 Allen, 283.

2. The first instruction prayed for should have been given. The contract set out in the declaration is entire, and the plaintiffs cannot maintain an action for a part performance of it. It comes within the principle stated in *Clark* v. *Baker,* 5 Met. 452. It was one bargain, and it matters not that the value of the bales was to be ascertained by the price affixed to each pound. The buyer might be unwilling to take a part, unless he could have the whole. If separable, it must be separable into as many parts as there are bales, and the plaintiff would have a distinct right of action for every bale. Similar contracts have been held to be entire, in *Olyphant* v. *McNair,* 41 Barb. 446, and *Davenport* v. *Buckland,* Hill & Denio, 75. See also Story on Sales, §§ 240, 242, 245; Story on Agency, § 170; 1 Parsons on Contracts, 82. Under an order to buy one hundred and fifty bales of cotton, it might fairly be inferred that the agent was authorized to buy in several lots of several parties, and to bind the principal to each of the vendors. But, as between his principal and himself, the principal would not be bound to take less than the whole quantity.

3. The contract was rescinded by mutual consent. The defendant repudiated the purchase immediately on being notified of it. The plaintiffs directed the defendant to deliver the bills of lading to their agent, and directed their agent to receive and sell the goods on their account; and these acts, in the absence

of any notice or other act on their part, constituted an assent to the repudiation by the defendant.   2 Parsons on Contracts, 191. Suppose that the cotton had been sold at a profit, could the defendant have recovered that profit from the plaintiffs?   The facts stated in the second prayer being undisputed, the question of rescission was a question of law for the court.   *Holbrook* v. *Burt*, 22 Pick. 547.

*J. G. Abbott*, for the plaintiffs.

AMES, J.   The case finds that the defendant employed the plaintiffs, who were cotton brokers in Mobile, to buy for him, at a price not exceeding forty-two cents per pound, one hundred and fifty bales of cotton.   Their instructions were substantially to buy " the best you can; " a form of expression which apparently left to them the largest possible discretion to buy as opportunities should offer, at prices not exceeding the prescribed limit. In about three months, they purchased, in part execution of their commission, and forwarded to the defendant in Boston, seventy-eight bales, which he refused to receive.   He lost no time in notifying the plaintiffs that he repudiated the purchase, and expressed his dissatisfaction that they had delayed the matter for so long a time, and then bought upon a falling market.   In consequence of this refusal on his part, the plaintiffs turned over the bill of lading to another commercial house in Boston, and caused the cotton to be sold on their own account, the result being a large pecuniary loss.

The defendant objects, among other things, that the plaintiffs have only partially fulfilled their commission ; that the order was specific and entire for the purchase of one hundred and fifty bales; that he was not bound to accept and pay for any less quantity; and that for that reason the plaintiffs have no right to maintain their action against him.   Whether under the terms of his answer, denying the plaintiffs' allegations in general terms, this objection is open to him, and also whether the circumstances attending the trial amounted to a waiver of this objection on his part, are questions which it will not be necessary to decide.   If the plaintiffs were employed to buy the entire quantity of one hundred and fifty bales, there is nothing

whatever in the case to indicate that they were to buy the whole quantity at the same time, or of the same person, or to forward the whole in the same vessel. The defendant refused to receive the cotton, not on the ground that the whole amount ordered had not been obtained, but on the ground that there had been unreasonable delay on the plaintiffs' part in executing their commission. He tells them that to wait three months and then buy on a falling market is " a mode of doing business that he is not used to." For this reason he notifies them that he repudiates the purchase — a notice which would certainly prevent them from buying the remaining seventy-two bales on his account. He is in no position now to take the objection that they sent only seventy-eight bales, for he refused to receive any, and expressed himself as being dissatisfied that after such a delay they should buy any cotton at all on his account. The first request for instructions to the jury on the part of the defendant was therefore justly and properly rejected by the presiding judge.

He was also requested to instruct the jury that, unless the plaintiffs, at the time they directed the defendant to turn over the bill of lading and the goods to other hands, notified him that they should hold him responsible for any loss in the sale of the cotton, they could not maintain their action. But if, in repudiating the purchase, the defendant had acted in violation of the plaintiffs' right, they were under no obligation to notify him that they should hold him responsible. This instruction the presiding judge therefore refused to give, and we think he was entirely right in that refusal, and also in the refusal to give the third instruction prayed for by the defendant, namely, " that, upon the uncontroverted facts of the case, the plaintiffs were not entitled to maintain their action." The uncontroverted facts are certainly quite as consistent with the plaintiffs' theory of the case as the defendant's. They had made a large purchase of cotton, and had drawn upon him for the price, and for their commissions. It was at least a question for the jury, whether there was in fact a mutual rescinding of the contract, or whether there was anything in the case but a breach of faith on the defendant's part, and an attempt on the part of the plaintiffs to protect their

drafts by applying towards their payment the cotton which was thrown back on their hands by the defendant.

The case appears to have been submitted to the jury with correct and proper rulings and instructions, and we see no cause for disturbing the verdict.                    *Exceptions overruled.*